**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| SHIRLEY PATTERSON, | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| **vs.** | ) | CIVIL ACTION NO. 07-00857-CG-B |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
|     **Defendant.** | ) | |

<u>**ORDER**</u>

This matter comes before the court on the defendant, United Parcel Service, Inc.'s ("UPS" or "defendant"), motion for summary judgment and motion setting out objections and seeking to strike portions of an affidavit that the plaintiff, Shirley Patterson ("Patterson" or "plaintiff"), filed in conjunction with her response to the motion for summary judgment. (Docs. 31 and 40). Both motions are briefed and ripe for ruling. (Docs. 31, 33, 36, 39, 40, and 41). For the reasons set forth below, the motion for summary judgment is **GRANTED**. The court addresses the arguments on the motion to strike Patterson's affidavit below.

**I.     COMPLAINT**

Patterson, an African-American female, sued UPS for racial and gender discrimination and for retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended, and pursuant to 42 U.S.C. § 1981. (Doc. 1, pp. 1-2, ¶¶ 1 and 5). Patterson started working part-time at UPS in 1990 and was promoted to full-time package car driver in June 1996. (Doc. 1, p. 3, ¶ 8). In July 2006, Patterson filed a grievance against a manager named Elaine Perry ("Perry"), who is a white female. (Doc. 1, p. 3, ¶ 9).

Patterson alleges that Perry and other supervisors retaliated against Patterson after she filed her grievance. (Doc. 1, p. 3, ¶ 9). In particular, Patterson had been driving a "P700" truck

for five years prior to filing her grievance.  (Doc. 1, p. 3, ¶ 10).  Shortly after filing her

grievance, Patterson was assigned to a "P1000" truck, which is higher off of the ground than a

P700 truck and, presumably unlike a P700, lacks power steering.  (Doc. 1, p. 3, ¶ 10).  Driving

the new truck allegedly injured Patterson's knees and back.  (Doc. 1, pp. 3-4, ¶ 10).  Patterson

"complained constantly about the truck and requested that her old truck be given back to her."

(Doc. 1, p. 4, ¶¶ 10 and 13).

Patterson also alleges that she was (1) falsely accused of being "over allowed," (2) forced

to deliver packages assigned to other drivers, (3) denied adequate "helpers" during the holiday

busy season, (4) subjected to "wrongful" surveillance by supervisors when she attended doctor's

appointments due to the injuries she suffered driving the P1000 truck, (5) not allowed to work in

"another capacity" after her doctor restricted her work activities, and (6) was denied the

opportunity to return to work in summer of 2007 and her worker's compensation was stopped.

(Doc. 1, pp. 4-5, ¶¶ 11-12, 14-15).

Counts One and Two are for retaliation under Title VII and § 1981.  (Doc. 1, pp. 5-6, ¶¶

16-21).  Count Three is for gender discrimination under Title VII.  (Doc. 1, p. 6, ¶¶ 22-23).

Counts Four and Five are for race discrimination in violation of Title VII and § 1981.  (Doc.1, p.

7, ¶¶ 24-27).

## II.    SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The

movant bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

> As succinctly stated by the Eleventh Circuit:
>
> A factual dispute is genuine only if "a reasonable jury could return a verdict for the nonmoving party." United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991) (citation omitted). The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the district court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

Info. Sys. and Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1224-25 (11th Cir. 2002). The purpose of summary judgment "is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995), cert. denied sub nom. Jones v. Resolution Trust Corp., 516 U.S. 817 (1995).

> In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." Ryan v. Int'l Union of Operating Engrs, Local 675, 794 F.2d 641, 643 (11th Cir. 1986). There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Blue Cross & Blue Shield v. Weitz, 913 F.2d 1544, 1550 (11th Cir. 1990). Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994) (citing Lazzara v. Howard A. Esser, Inc., 802 F.2d 260, 269 (7th Cir. 1986)), cert. denied, 513 U.S. 868, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994).

Id. at 599. The "complete failure of proof concerning an essential element of the nonmoving

party's case necessarily renders all other facts immaterial."   <u>Celotex Corp.</u>, 477 U.S. at 323.

The failure by the nonmoving party to make a sufficient showing on an essential element of its

action entitles the moving party to judgment as a matter of law.  <u>Id</u>. at 323.

## III.   FACTS

UPS initially hired Patterson in 1990 as a part-time worker at the UPS facility in Loxley,

Alabama (the "Loxley Center").  (Doc. 31-2, p. 1).  She was promoted to a full time position in

Loxley as a package car driver in 1996.  (Doc. 31-2, p. 1).  UPS uses the term "package car" to

refer to the "trucks" referenced in Patterson's complaint.  (Doc. 31-10, p. 2, ¶ 2).  This order will

use those terms interchangeably.

### A.   Retaliation

#### 1.   Triggering Event for Retaliation Claim

The grievance referenced in Patterson's complaint stemmed from a July 13, 2006,

incident that occurred while Patterson and Perry were walking side by side on a customer's lawn

in a residential neighborhood.  (Doc. 31-8, pp. 28-29).  Patterson described it as "rubbing up

against me in a very sexual way where it is not normal for women to do."  (Doc. 31-8, p. 28).

Specifically, Perry's hand or arm rubbed up against Patterson's arm.  (Doc. 31-8, pp. 30-32).

Patterson told Perry to "stop it," which Perry did.  (Doc. 31-8, p. 32).  Although Perry "got

mad," nothing further was said between the two of them regarding the incident.  (Doc. 36-3, p. 3,

¶ 5; Doc. 31-8, p. 32).

Patterson left voice mails with UPS's human resources department in Birmingham,

Alabama, on July 14, 2006, and, within a day or two, described the incident as "sexual

harassment" to Jeff Poulter ("Poulter") when he returned Patterson's call.  (Doc. 36-3, p. 4, ¶ 7).

Although Poulter told Patterson that "he would get some people down to investigate the situation," no such investigation ever took place.  (Doc. 36-3, p. 4, ¶ 7).  There is no evidence that any UPS employee other than Patterson and Poulter knew about the July 14, 2006, telephone call.  (Doc. 31-14, p. 4, ¶ 6).

Patterson later communicated her complaint to UPS by submitting a grievance form dated July 24, 2006, with an accompanying letter to her union representative.  (Doc. 31-6, pp. 26-27; Doc. 36-6; Doc. 36-7).  Her grievance includes several accusations against Perry that have no direct bearing on this lawsuit.  Patterson described the July 13, 2006, incident in her July 24, 2006, grievance as follows: "Perry's confrontations during the residential stop involved her invading my personal space by continuing to rub up against me in an inappropriate manner.  In my opinion she was physically too close in making a point regarding my job performance on various occasions."  (Doc. 36-6, p. 4; Doc. 36-7, pp. 16-17).[1]

Nothing in the grievance describes Perry's sexual preferences but Patterson produced evidence tending to show that Perry is either gay or bisexual and that UPS and Patterson knew Perry's sexual orientation before July 13, 2006.  (Doc. 36-11, p. 4).

Patterson says that, along with Perry, three Loxley supervisors by the names of Chad Johnson ("Johnson"), Randy Young ("Young"), and Bertram Flood ("Flood") retaliated against

---

[1] Perry also apparently told Patterson that "it didn't have to be this way if [Patterson] would have come around" in late March 2007.  (Doc. 36-3, p. 12, ¶ 29).  Patterson does not explain why she considers this comment to have been sexual harassment or how it has anything to do with the July 24, 2006, grievance at issue.  To be sure, Patterson says that she filed "another grievance" against Perry on March 1, 2007, but there is no indication that the March 1, 2007 grievance is a statutorily protected expression, or that either party is treating it as one.  (Doc. 36-3, p. 11, ¶ 26).  Further, Perry's comment that "it didn't have to be this way," post-dates both the July 24, 2006 grievance and the March 1, 2007 grievance.

her.  (Doc. 31-6, p. 40).  Patterson does not claim that anybody other than Perry, Johnson, Young, or Flood retaliated against her.  (Doc. 39-2, p. 2).

Patterson accuses Perry of retaliating in the following ways: (1) assigning Patterson a P1000 truck after Patterson filed her grievance, (2) failing to honor Patterson's request to get her P700 truck back, (3) not allowing Patterson to get medical attention, (4) denying Patterson a helper, (5) refusing to remove customer stops or loads off of Patterson's route pursuant to Patterson's request, (6) challenging Patterson about her method of getting in and out of her truck, and (7) "lying" about Patterson or "turning around" what Patterson said.  (Doc. 31-6, pp. 40-42).  Perry is the center manager at Loxley Center.  (Doc. 31-7, p. 22).

In addition to the claims that Patterson makes against Perry, Patterson complains that Flood refused to give Patterson a helper and told Patterson that she should wear her UPS uniform when she was working a light duty position, referred to as "temporary alternate work."  (Doc. 31-6, p. 42-43).  Johnson allegedly refused to return Patterson's P700 to her and refused to decrease the load of packages Patterson was expected to deliver.  (Doc. 31-6, p. 43).  Flood and Johnson also accompanied Patterson on separate occasions when she visited UPS's doctor. (Doc. 31-6, p. 10; Doc. 31-8, pp. 14-15).

Although Perry testified via declaration that she did not think that the July 24, 2006, grievance asserted a sexual harassment claim, Perry did read the grievance.  (Doc. 31-13, p. 4, ¶ 8).  The court assumes for purposes of summary judgment that Perry knew Patterson accused Perry of sexual harassment.  On the other hand, during the time that is relevant to this case, Flood, Johnson, and Young were unaware of Patterson's assertion that Perry sexually harassed her.  (Doc. 31-11, p. 6, ¶ 8; Doc. 31-12, p. 4, ¶ 6; Doc. 31-15, p. 4, ¶ 6).

6

### 2.     Patterson's Truck and Route

Patterson drove a P700 truck, which is smaller than a P1000 truck, for several years prior to 2006.  (Doc. 31-7, p. 2).  During the relevant period, the Loxley Center operated package cars that it referred to as P500, P700, P1000, and P1200.  (Doc. 31-7, pp. 2-3).  The larger the number, the larger the package car.  (Doc. 31-7, p. 3).

The Loxley Center Preload and Dispatch Supervisor, Don Annan ("Annan"), was responsible for deciding which kinds of trucks were assigned to which routes.  (Doc. 31-10, p. 2, ¶ 2).  He assigned Patterson a P1000 truck in February, March, or April 2006.  (Doc. 31-7, pp. 7-8).  Patterson only drove the P1000 for about two days because Annan gave Patterson a P700 back after Patterson complained about having to drive the larger P1000.  (Doc. 31-7, p. 7).  The P1000 truck was reassigned to Patterson's route during the summer of 2006, while Patterson was on a medical leave of absence.  (Doc. 31-7, pp. 9-10).

Troy Moore ("Moore"), who drove Patterson's route while Patterson was off work, drove the P1000 on Patterson's route.  (Doc. 31-7, pp. 9-11).  Although Perry never told Patterson that Perry was behind the reassignment of trucks, Patterson attributes the truck assignment to Perry based on a comment from Moore.  (Doc. 31-7, p. 12).  Moore called Patterson during her leave of absence to tell her that her route was assigned a P1000 and, although Perry never told Moore that she assigned the P1000, Moore speculated that Perry assigned the new vehicle because Patterson upset Perry.  (Doc. 31-7, p. 12).

Patterson returned to work in September 2006, after Labor Day, and started driving the P1000.  (Doc. 31-7, pp. 7-10).  Patterson got her P700 back for one day in February 2007 while her P1000 was "red tagged for maintenance and repair."  (Doc. 36-3, p. 10-11, ¶¶ 23 and 24).  At

that time, Perry noticed that Patterson was driving a P700.  Perry said "oh, you're in [the P700] huh," then "stared at [Patterson] and kept going."  (Doc. 36-3, pp. 10-11, ¶ 23).  Other than that brief exception, Patterson continuously drove the P1000 on her route after that time.  (Doc. 31-7, p. 8).  A P1000 has been assigned to Patterson's route from Labor Day 2006 through the present day.  (Doc. 31-7, pp. 8-9).

Patterson describes the P1000 as too high off of the ground for Patterson and difficult to steer.  (Doc. 36-3, p. 5, ¶ 10).

Patterson had four conversations with Perry about having a P700 reassigned to her route.  (Doc. 31-7, pp. 118-20).  The first time that Patterson complained to Perry, Perry replied to say that she was unaware that Patterson had a P1000.  (Doc. 31-7, p. 17).  The second time Patterson raised the topic, Perry responded "[w]e don't give drivers back their trucks by request."  (Doc. 31-7, pp. 17-18).  The third time that Patterson complained to Perry, Perry said, "I will see what I can do."  (Doc. 31-2, p.6).  The record does not show what happened on the fourth time Patterson raised the issue to Perry.  Patterson also spoke to Johnson and Annan about getting her P700 back.  (Doc. 36-3, p. 8, ¶ 17).  Johnson told Patterson to "see Elaine" Perry.  (Doc. 36-3, p. 8, ¶ 17).  Annan said that he would see what he could do.  (Doc. 36-3, p. 8, ¶ 17).

Patterson testified that Annan was the supervisor a driver should contact if the driver wants a different truck and that Annan "always handled the trucks or the air or the packages."  (Doc. 36-3, p. 8, ¶ 17; Doc. 31-8, p. 14).[2]  UPS assigns package cars by route based on business

---

[2]Patterson offers inadmissible evidence to contradict Annan's assertion that he was the one who assigned trucks to routes.  First, Patterson recites a conversation she had with Moore, during which Moore suggested that Elaine assigned Patterson the P1000.  (Doc. 31-7, p. 12; Doc. 36-3, p. 4, ¶ 9).  Patterson cannot use this evidence to establish that Perry assigned her the P1000 because it is hearsay.  Second, Patterson says that she asked Johnson for her P700 back.  (Doc.

needs, not by driver.  (Doc. 31-10, p. 3, ¶ 4).  The package volume and size of a route are the determining factors for deciding which size and type package car is operated on a particular route.  (Doc. 31-10, p. 3, ¶ 4).  Driver preference is not a factor; drivers are expected to drive all of the trucks that are available at their center.  (Doc. 31-10, pp. 2-3, ¶¶ 3-4).

When Annan reviewed the Loxley Center routes in 2006, he decided that some adjustments were needed because the number of customers that Loxley Center services had increased significantly over recent years.  (Doc. 31-10, p. 3, ¶ 5).  The increased number of customer stops and volume of packages on Patterson's route called for a larger truck than the P700 that Patterson had been driving.  (Doc. 31-10, p. 3, ¶ 5).  Annan assigned a P1000, the next larger truck, to the route to meet the increased demand.  (Doc. 31-10, p. 3, ¶ 5).  Occasionally during the spring and summer of 2006, a P700 might have been assigned to Patterson's route while Annan adjusted his fleet but Annan decided before July 2006 that a P1000 was the proper truck for the route that Patterson drove.  (Doc. 31-10, p. 3-4, ¶ 5).  A P1000 has been assigned to Patterson's former route since the summer of 2006, even when other drivers were working on that route.  (Doc. 31-10, p. 5, ¶ 9).

Annan also decided what stops and loads were assigned to the Loxley delivery routes. (Doc. 31-10, p. 2, ¶ 2).  The number of customer stops and loads on a route is determined only

---

36-3, p. 5, ¶ 10).  "With a smirk on his face, [Johnson] replied, 'you will need to see Elaine about that.'"  (Doc. 36-3, p. 5, ¶ 10).  This statement is also inadmissible to show the truth of what Johnson said because it is hearsay.  Perry never told Patterson that she assigned the P1000 to Patterson's route.  (Doc. 31-7, pp. 17 and 19).  FED. R. CIV. P. 56(e) (An affidavit submitted in conjunction with a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."); FED. R. EVID. 801, 802, 803, 804, 805, and 807 (the hearsay rule and its exceptions); Macuba v. DeBoer, 193 F.3d 1316, 1322-24 (11th Cir. 1999) (discussing proper application of hearsay rule to motions for summary judgment).

by business demand.  (Doc. 31-10, pp. 4-5, ¶ 8).  Package car drivers who drove Patterson's route since 2006 were required to make as many or more stops and to deliver an equivalent volume of packages as Patterson.  (Doc. 31-10, p. 5, ¶ 9).

Annan was unaware of the possibility that Patterson accused Perry of sexual harassment in her grievance.  (Doc. 31-10, p. 4, ¶ 6).  Annan did not know that Patterson had filed a grievance at all when he assigned the P1000 to Patterson's route.  (Doc. 31-10, p. 4, ¶ 6).  He made his decisions regarding the truck on Patterson's route and the number of stops and loads on Patterson's route without influence from Perry.  (Doc. 31-10, pp. 4-5, ¶¶ 7 and 8).

Although Annan testified that he does not assign loads based on driver preference, Patterson found a note for Annan from another UPS driver named Donnie Fore ("Fore"), requesting assignment to a specific truck.  (Doc. 36-3, pp. 6-7, ¶ 14).  The request was honored the next day.[3]  (Doc. 36-3, pp. 6-7, ¶ 14).  Annan testified that the truck Fore requested was his standard truck, which had been undergoing mechanical service.  (Doc. 31-10, p.5, ¶ 10).

Patterson was "constantly harassed" about being "over allowed."  (Doc. 36-3, pp. 6-7, ¶¶ 13 and 15).[4]  Patterson was expected to deliver "more of her next day air packages, instead of letting an air driver deliver them," which saddled Patterson with additional time constraints.

---

[3]Patterson swears by affidavit that Fore told her he requested a specific truck because the truck he was driving was too high off of the ground and was causing him back problems.  Fore also apparently told Patterson that Perry was retaliating against Patterson for "calling HR on her."  (Doc. 36-3, pp. 6-7, ¶ 14).  These statements are stricken from Patterson's affidavit because they are hearsay.  Patterson's assertion in her affidavit that her union steward told her that "a little bird told him that she needed to watch herself, that they are trying to fire you," is also stricken as hearsay.

[4]Neither party explains what the term "over allowed" means.  In context, it appears to mean that a driver who took more than the allowed amount of time to make deliveries would be "over allowed."

(Doc. 36-3, pp. 6-7, ¶¶ 13 and 15).

### 3.      Patterson's Method of Entering and Exiting Her Truck

Patterson testified that Perry gave her incorrect instructions about how to get on and off

of her truck.  (Doc. 31-7, pp. 40-41).  Perry told Patterson to use a handrail to get on and off of

her truck but another, unnamed individual, told Patterson that she could hold on to the door of

the truck to help her enter and exit it.  (Doc. 31-7, p. 41).  The unnamed individual, who was

Perry's supervisor, said that Patterson could "grab[] on to the sides of the truck [to] pull[]

yourself in," because Patterson was too short to reach the handrail comfortably.  (Doc. 31-7, p.

41).  Loxley Center management representatives periodically follow or ride along with drivers to

ensure that they are adhering to safety procedures.  (Doc. 31-13, pp. 3-4, ¶ 5).  Perry conducted

one such ride along with Patterson on July 13, 2006.  (Doc. 31-13, p. 3, ¶ 5).  One safety

procedure is to use a truck's handrails when entering or exiting the truck.  (Doc. 31-13, p. 3, ¶ 5).

This procedure applies to all package drivers.  (Doc. 31-13, p. 3, ¶ 4).  Patterson mentioned

Perry's complaint about Patterson's failure to use the handrail in her July 24, 2006, grievance.

(Doc. 36-6, p. 3).

### 4.      Medical Care

Regarding Perry's refusal to allow Patterson to seek medical attention, Patterson testified

that no UPS employee interfered with Patterson's efforts to visit her personal doctor.  (Doc. 31-

7, p. 23).  The extent of Patterson's complaint is that Perry or other Loxley Center management

employees should have made an appointment for Patterson to meet with a worker's

compensation doctor at UPS's expense.  (Doc. 31-7, p. 25).  Patterson also complains that, when

UPS did schedule her an appointment with a UPS doctor, Patterson was inappropriately

11

accompanied on her doctor's visits.  (Doc. 31-6, p. 10; Doc. 31-8, pp. 14-15).  The only

supervisors that Patterson says accompanied her to the doctor are Flood and Johnson.

Perry was not responsible for arranging an appointment for Patterson with UPS's

worker's compensation doctor.  (Doc. 31-13, pp. 8-10, ¶ 16).  In general, Perry cannot send

employees to a doctor unless the health and safety managers for their district have directed her to

do so, or unless immediate care is required.  (Doc. 31-13, pp. 8-10, ¶ 16).  When an employee

makes a claim for worker's compensation benefits or claims to have suffered an injury at work,

the management for Loxley Center alerts the district representatives.  (Doc. 31-13, pp. 8-10, ¶

16).  Sometimes, but not always, the management at Loxley Center is instructed to schedule a

doctor's appointment with the worker's compensation doctor.  (Doc. 31-13, pp. 8-10, ¶ 16).

In this case, when Perry learned that Patterson wanted UPS to schedule a doctor's

appointment in 2007, Patterson's request was forwarded to the district management responsible

for administering worker's compensation and also to the district safety manager.  (Doc. 31-13,

pp. 8-10, ¶ 16).  The management at Loxley Center let the district management know that

Patterson thought that her back and knees hurt as a consequence of getting on and off of her

truck.  (Doc. 31-13, pp. 8-10, ¶ 16).  Loxley Center was not instructed to make a doctor's

appointment with respect to these complaints until Patterson returned to work in March 2007,

following a leave of absence that Patterson began in late February 2007.  (Doc. 31-13, pp. 8-10,

¶ 16).  At that time, Patterson presented with a note from her doctor, releasing her to work with

modified duties and district health and safety management instructed Loxley Center management

to make an appointment with the UPS doctor to determine if UPS could return Patterson to work

safely.  (Doc. 31-13, pp. 8-10, ¶ 16).  Loxley Center management made the appointment and one

12

of Patterson's supervisors escorted her to the doctor's office.  (Doc. 31-13, pp. 8-10, ¶ 16).

Patterson visited the UPS doctor more than once after July 24, 2006.  Flood accompanied Patterson to the UPS doctor twice.  (Doc. 31-8, pp. 10-11).[5]  Johnson accompanied Patterson to the UPS doctor several times.  (Doc. 31-8, pp. 14-15).  There is no evidence that any other UPS employee accompanied Patterson on her trips to the UPS doctor.

Despite the foregoing protocol about accompanying employees to the UPS doctor, Patterson testified that she broke her hand at work in 2003.  (Doc. 36-3, p. 13, ¶ 32).  Patterson was allowed to see a doctor without an escort.  (Doc. 36-3, p. 13, ¶ 32).  Other employees were allowed to see company doctors without escorts.  (Doc. 31-8, pp. 11-12).

### 5.    Helper

Regarding Patterson's complaint that Perry denied Patterson a helper, the record shows that UPS employs seasonal or part-time workers during their peak, or holiday, season.  (Doc. 31-11, p. 5, ¶ 6).  On one or more occasions during the peak season in 2006, Patterson asked a supervisor for a helper and either did not receive one at all or received one too late for the helper to be helpful.  (Doc. 31-7, pp. 25-27; Doc. 36-3, pp. 8-9, ¶ 18).

In 2006 and several other years, Loxley Center could not hire enough helpers, leaving Loxley Center with a shortage of helpers and forcing supervisors to allocate an insufficient number of helpers among the drivers.  (Doc. 31-10, p. 6, ¶ 11).  Assignment of helpers was based on a calculation the Loxley Center undertook of the number of stops on the various routes, the

---

[5]Patterson testified that "[w]henever I had to go to the doctor, Burt Flood was told by Elaine Perry that he had to carry me."  (Doc. 31-8, p. 10).  Patterson does not cite to this fact in her response.  Indeed, she does not claim that Perry retaliated against her by "sending" other supervisors to escort Patterson to her doctor's visits.  (Doc. 31-2, p. 5).

stops per hour measured per driver, and the volume per route.  (Doc. 31-11, p. 5, ¶ 6).  Patterson

was assigned a helper on several dates in the 2006 peak season but, like other drivers, UPS could

not meet all of Patterson's requests for a helper.  (Doc. 31-10, p. 6, ¶ 11).  Apparently, at least

two of the helpers assigned to Patterson were not particularly helpful.  (Doc. 36-3, p. 8, ¶ 18).

On December 18, 2006, Patterson asked Flood and Young for a helper.  (Doc. 36-3, p. 8,

¶ 18).  Both Flood and Young told Patterson that she could not have one.  (Doc. 36-3, p. 8, ¶ 18).

Another driver named Mickey Harvard ("Harvard") called Patterson over lunch that day to say

that he tried to give Patterson his helper.  Harvard told Flood that he did not need a helper that

day.  Flood told Harvard that Patterson could not have a helper because she was routinely two

hours late.  Patterson says that Harvard is likewise routinely two hours late.  Patterson was given

a helper later that day at 6:30 or 7:00.  (Doc. 36-3, pp. 8-9, ¶ 18; Doc. 31-7, pp. 25-26).

Perry testified that she was not involved with assigning helpers on any routes during

2006, and that she was specifically uninvolved "in the decision whether or not to allow Ms.

Patterson a helper in 2006."  (Doc. 31-13, pp. 7-8, ¶ 15).  Although Patterson testified that her

complaint against Perry included Perry's refusal to assign Patterson helpers when she requested

them, Patterson later clarified that she never asked Perry for a helper or discussed her request for

a helper with Perry.  (Doc. 31-6, p. 40; Doc. 31-7, p. 26).

### 6.      Lying and "Turning Things Around"

Patterson premises her claim that Perry lied about her or turned things around on a note

Perry made, inaccurately memorializing a March 2007 conversation between the two.  (Doc. 31-

7, pp. 45-47).  The offensive note accuses Patterson of refusing to sign a document.  (Doc. 31-9,

p. 34).  Patterson came across the note crumpled up in the trash in March 2007 while she was

14

rummaging through the garbage at UPS.  (Doc. 31-7, pp. 48; Doc. 31-8, pp. 1-3).

### B.    Gender Discrimination

Patterson's gender discrimination claim is based on two complaints.  First, Patterson does not believe that, as a woman, she should have to drive a P1000.  Second, Patterson does not believe that Perry would have made the physical contact with her in July 2006 if Patterson was male.  (Doc. 31-8, pp. 18-19, 23-24).

## IV.    THE BURDEN-SHIFTING FRAMEWORK

Patterson brings all of her claims pursuant to Title VII and § 1981.  The legal framework under both statutes is the same.  Ferrill v. Parker Group, 168 F.3d 468, 472 (11th Cir. 1999) ("The test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases.").  See also Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (Title VII and § 1981 "have the same requirements of proof and use the same analytical framework . . . .");  Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir. 1985) ("Where . . . a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical."). Because the test for intentional discrimination is the same under Title VII and § 1981, the court will analyze this case under the analytical framework established in Title VII.

As is often true, there is no direct evidence of discrimination in this case.[6]  Consequently,

---

[6]See Perryman v. Johnson Products Co., Inc., 698 F.2d 1138, 1143 (11th Cir. 1983) ("[S]ome plaintiffs are able to prove the existence of discriminatory intent by direct evidence;  in these rare cases, the plaintiff is not required to rely on the inference of discrimination created by the prima facie case of McDonnell Douglas.");  EEOC v. Reichhold Chemicals, Inc., 988 F.2d 1564, 1570 (11th Cir. 1993) ("This circuit has clarified . . . that a Title VII plaintiff need not submit direct proof of intent to discriminate, but can rely on circumstantial evidence.  Requiring direct evidence would eviscerate Title VII's effectiveness because direct evidence rarely exists

Patterson can utilize the burden shifting procedure that the Supreme Court articulated in

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  As explained in E.E.O.C. v. Joe's

Stone Crabs, Inc., 296 F.3d 1265 (11th Cir. 2002):

> Under this framework, the plaintiff initially must establish a prima facie case of discrimination.  By establishing a prima facie case, the plaintiff creates a rebuttable presumption that the employer unlawfully discriminated against her.  The burden then shifts to the employer to rebut this presumption by producing evidence that its action was taken for some legitimate, non-discriminatory reason.  Should the employer meet its burden of production, the presumption of discrimination is rebutted, and the inquiry "proceeds to a new level of specificity," in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination.  Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff.

Id. at 1272-73 (citations omitted).

In McDonnell Douglas, the Supreme Court outlined the following four elements for a

plaintiff to show in order to make a prima facie case:

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

McDonnell Douglas, 411 U.S. at 802.[7]  Although the court outlined a fairly specific four-part

prima facie case, the court cautioned that "[t]he facts necessarily will vary in Title VII cases, and

the specification above of the prima facie proof required from [plaintiff] is not necessarily

_____

in disparate treatment cases.") (citations omitted).

[7]Of course, a plaintiff need not belong to a minority group in order to meet the first element of the prima facie case.  See Bass v. Board of County Com'rs, Orange County, Fla., 256 F.3d 1095, 1102-03 (11th Cir. 2001).

applicable in every respect to differing factual situations." Id. at 802 n.13.

The Eleventh Circuit has followed the instruction to apply prima facie tests in a flexible manner. "The methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." Wilson v. B/E Aero., Inc., 376 F.3d 1079, 1087 (11th Cir. 2004) (internal citations omitted).

Counts One and Two allege claims for retaliation under Title VII and § 1981. To make a prima facie case for retaliation, Patterson must show "1) a statutorily protected expression; 2) an adverse employment action; 3) a causal link between the protected expression and the adverse action." Sullivan v. AMTRAK, 170 F.3d 1056, 1059 (11th Cir. 1999) (citations omitted).

Counts Three, Four, and Five allege claims for gender discrimination and racial discrimination under Title VII and § 1981. To make a prima facie case in support of those claims, Patterson must show that:

> (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job.

Burke-Fowler v. Orange County, 447 F.3d 1319, 1323 (11th Cir. 2006). The adverse employment action at issue in Counts Three, Four, and Five must involve "a serious and material change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original).

If Patterson sets up a prima facie case, the burden will shift to UPS to articulate a

legitimate, nondiscriminatory reason for its actions.  As explained in <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981),

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff [suffered an adverse employment action] for a legitimate, nondiscriminatory reason.  The defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.  To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons [why plaintiff suffered an adverse employment action]. . . . Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.  The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

<u>Id.</u> at 254-56 (internal citation omitted).  <u>See also</u>, <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th Cir. 1997) (same).

To emphasize, "[t]his burden is one of production, not persuasion; it 'can involve no credibility assessment.'" <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 142 (2000) (quoting <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 509 (1993)).

With respect to the retaliation claims, UPS can meet its burden of production by showing that, even, assuming the challenged action was motivated in part by retaliation, the challenged action would have occurred without the retaliatory motive.  <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1268-69 (11th Cir. 2001) ("the mixed-motive defense remains good law . . . with respect to [a] Title VII retaliation claim.").  <u>See also</u> <u>Tucker v. Hous. Auth.</u>, 229 Fed. Appx. 820, 825 (11th Cir. 2007) ("In retaliation cases, 'an employer can avoid liability if it can prove that it would have made the same disputed employment decision in the absence of the alleged bias.'") (quoting <u>Pennington</u>, 261 F.3d at 1269).

18

If UPS meets its burden of production, Patterson will have to establish pretext. The Eleventh Circuit undertook a thorough analysis of the plaintiff's burden to establish pretext in the Combs case. The defendant in that case argued that it was entitled to a judgment as a matter of law "even if a reasonable factfinder could have rejected each of its proffered nondiscriminatory reasons for [subjecting the plaintiff to an adverse employment action], because [the plaintiff] had the additional burden of demonstrating that [the defendant's] decision was motivated by racial animus." Combs, 106 F.3d at 1527.[8] The defendant argued that, even if the plaintiff had produced evidence to discredit the nondiscriminatory reason it proffered in response to the prima facie case, the plaintiff had not produced evidence to show that discrimination was the true reason for the adverse employment action that befell the plaintiff. Id.

The Combs court based its analysis on the Hicks case from the Supreme Court and several Eleventh Circuit cases that followed Hicks. As the Combs court explained:

Although the Supreme Court in Hicks rejected the position that disbelief of the employer's proffered reasons requires judgment for the plaintiff, the Court was careful to explain that such disbelief, in tandem with the plaintiff's prima facie case, is sufficient to permit the factfinder to infer discrimination. The Court said:

The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is required."

Combs, 106 F.3d at 1529 (emphases in Combs).

_____

[8]Although Combs addressed judgments as a matter of law and not summary judgments, the analysis is the same under both procedural devices. Combs, 106 F.3d at 1534 n.8.

The <u>Combs</u> court interpreted <u>Hicks</u> as providing that a plaintiff is entitled to overcome summary judgment and judgment as a matter of law if it demonstrates a genuine issue of fact as to the truth of each of the defendant's articulated nondiscriminatory reasons. <u>Id</u>. at 1529. The weight of the Eleventh Circuit cases to follow <u>Hicks</u> "uniformly hold that once a plaintiff has established a prima facie case and has put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its actions," the plaintiff will prevail over a defendant's motion for summary judgment. <u>Id</u>. at 1532. As the Supreme Court subsequently explained in <u>Reeves</u>, the upshot of <u>Combs</u> is that a "prima facie case combined with sufficient evidence to disbelieve [the] employer's explanation always creates [a] jury issue of whether [the] employer intentionally discriminated." <u>Reeves</u>, 530 U.S. at 140, citing <u>Combs</u>.

<u>Reeves</u> limited the <u>Combs</u> decision somewhat by holding that "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." <u>Id</u>. at 148. <u>Reeves</u> tells courts to consider the following factors to determine whether a judgment as a matter of law or, in this case, summary judgment, is appropriate even if the plaintiff sets up a prima facie case and discredits the defendant's response: "[1] the strength of the plaintiff's prima facie case, [2] the probative value of the proof that the employer's explanation is false, and [3] any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law [or summary judgment]." <u>Id</u>. at 148-49.

Still, a prima facie case and evidence to discredit the defendant's explanation for its actions "may permit a finding of liability." <u>Id</u>. at 149. <u>See also</u> <u>Chapman v. AI Transport</u>, 229

20

F.3d 1012, 1025 n.11 (11th Cir. 2000) (recognizing that <u>Reeves</u> modified <u>Combs</u> in the sense

that <u>Reeves</u> recognized that there are occasions when an employer could obtain a judgment as a

matter of law or summary judgment even if a plaintiff sets up a prima facie case and discredits

all of the defendant's articulated, nondiscriminatory reasons for its actions) <u>and</u> <u>Hinson</u>, 231 F.3d

at 831-32 (also recognizing the <u>Reeves</u> limitation on <u>Combs</u>, but finding that the plaintiff should

have survived summary judgment in the district court after setting up a prima facie case and

discrediting the defendant's asserted justification for its actions).

     A plaintiff can show pretext in several ways, including showing that the defendant's

proffered explanation is false, <u>Reeves</u>, 530 U.S. at 144, or insincere, <u>Vessels</u>, 408 F.3d at 771.

Although "[t]he employer may fire [or take other action concerning] an employee for a good

reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its

action is not for a discriminatory reason," <u>Nix v. WLCY Radio/Rahall Communications</u>, 738

F.2d 1181, 1187 (11th Cir. 1984), a plaintiff may show pretext by calling into question the facts

on which the employer says it relied to make its decision, as long as the plaintiff also shows that

the employer knew the facts on which it says it relied were false when it made its employment

decision, <u>Vessels</u>, 408 F.3d at 771.  <u>Combs</u> described the heart of the inquiry as:

> a highly focused one.  The district court must, in view of all the evidence,
> determine whether the plaintiff has cast sufficient doubt on the defendant's
> proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude
> that the employer's proffered "legitimate reasons were not what actually
> motivated its conduct[.]"[]  The district court must evaluate whether the plaintiff
> has demonstrated "such weaknesses, implausibilities, inconsistencies,
> incoherencies, or contradictions in the employer's proffered legitimate reasons for
> its action that a reasonable factfinder could find them unworthy of credence."

<u>Combs</u>, 106 F.3d at 1538 (citations omitted).  If UPS chooses the mixed-motive defense,

Patterson will have to disprove it.  <u>Pennington</u>, 261 F.3d at 1269-70.

**V.    THE MOTION IS GRANTED AS TO COUNT THREE FOR GENDER
DISCRIMINATION AND AS TO COUNTS FOUR AND FIVE FOR RACE
DISCRIMINATION.**

UPS argues that Patterson cannot set up a prima facie case in favor of her gender

discrimination claim, that Patterson cannot rebut UPS's articulated nondiscriminatory reason for

taking the action it did and that, to the extent Patterson's gender discrimination claim is based on

the July 13, 2006, incident with Perry, it is time-barred.  Patterson did not respond.  As explained

above, "the onus is upon the parties to formulate arguments; grounds alleged in the complaint

but not relied upon in summary judgment are deemed abandoned."  Resolution Trust, 43 F.3d at

599.  The motion for summary judgment is **GRANTED** on Count Three because Patterson

abandoned it.

Similarly, Patterson expressly abandoned Counts Four and Five for race discrimination.

(Doc. 31-6, p. 8).  The motion for summary judgment is **GRANTED** as to Counts Four and Five.

**VI.    THE MOTION IS GRANTED AS TO COUNTS ONE AND TWO FOR
RETALIATION.**

Title VII includes an "anti-retaliation" provision, which makes it unlawful "for an

employer to discriminate against any of his employees . . . because he has opposed any practice

made an unlawful employment practice by this title, or because he has made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under this

title."  42 U.S.C. § 2000e-3(a).  "To recover for retaliation, the plaintiff need not prove the

underlying claim of discrimination which led to her protest, so long as she had a reasonable good

faith belief that the discrimination existed."  Gupta v. Florida Bd. of Regents, 212 F.3d 571, 586

(11th Cir. 2000) (internal quotations and citations omitted).

**A.    Statutorily Protected Expression**

In order to satisfy the first element of her prima facie case, Patterson must show that she engaged in  "a statutorily protected expression." Sullivan, 170 F.3d at 1059. Patterson argues that her July 24, 2006, grievance was a statutorily protected expression. See Rollins v. Florida Dep't of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989) ("The protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those . . . who informally voice complaints to their superiors or who use their employers' internal grievance procedures."). In order for Patterson's grievance to qualify as a "statutorily protected expression," Patterson "must show that she had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002) (quotations and citations omitted).

> It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component.  A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented.  It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

Id. at 1312 (quotation and citation omitted, emphases in original).

The evidence in the record shows that Patterson's belief that she was sexually harassed is not objectively reasonable.  Construing all of the facts in Patterson's favor on summary judgment, the facts making up Patterson's claim that she was sexually harassed are that Perry briefly touched Patterson's arm, once on July 13, 2006, and stopped when Patterson asked her to do so.  The objective reasonableness of Patterson's belief that Perry sexually harassed her is measured "against existing substantive law." Tatt v. Atlanta Gas Light Co., 138 Fed. Appx. 145, 147 (11th Cir. 2005) (quoting Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir.

1999)).

The Eleventh Circuit explained the elements of a sexual harassment case in the

<u>Gupta</u> decision as follows:

> There are two types of sexual harassment cases: (1) quid pro quo, which are
> "based on threats which are carried out" or fulfilled, and (2) hostile environment,
> which are based on "bothersome attentions or sexual remarks that are sufficiently
> severe or pervasive to create a hostile work environment." <u>Burlington Industries,
> Inc. v. Ellerth</u>, 524 U.S. 742, 751, 118 S. Ct. 2257, 2264, 141 L. Ed. 2d 633
> (1998).
>
> ***
>
> This Court set forth in <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238 (11th Cir. 1999)
> (en banc), the elements that an employee must establish to support a hostile
> environment claim under Title VII based on harassment by a supervisor.  An
> employee must establish:
>
> > (1) that he or she belongs to a protected group; (2) that the
> > employee has been subject to unwelcome sexual harassment, such
> > as sexual advances, requests for sexual favors, and other conduct
> > of a sexual nature; (3) that the harassment must have been based
> > on the sex of the employee; (4) that the harassment was
> > sufficiently severe or pervasive to alter the terms and conditions of
> > employment and create a discriminatorily abusive working
> > environment; and (5) a basis for holding the employer liable.
>
> <u>Id</u>. at 1245.  The fourth element – that the conduct complained of was
> "sufficiently severe or pervasive to alter the conditions of employment and create
> an abusive work environment" – is the element that tests the mettle of most sexual
> harassment claims.  Requiring the plaintiff to prove that the harassment is severe
> or pervasive ensures that Title VII does not become a mere "general civility
> code." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788, 118 S. Ct. 2275,
> 2283-84, 141 L. Ed. 2d 662 (1998).  This requirement is regarded "as crucial, and
> as sufficient to ensure that courts and juries do not mistake ordinary socializing in
> the workplace – such as male-on-male horseplay or intersexual flirtation – for
> discriminatory 'conditions of employment.'" <u>Oncale v. Sundowner Offshore
> Services, Inc.</u>, 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998).

<u>Gupta</u>, 212 F.3d at 582-83 (footnote omitted).

The fourth element above, whether the harassment was severe or pervasive enough to

alter the terms and conditions of the plaintiff's employment, is itself subject to a multi-factor

test.  Its analysis turns on:

> "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the
> conduct is physically threatening or humiliating, or a mere offensive utterance;
> and (4) whether the conduct unreasonably interferes with the employee's job
> performance."

Id. at 584 (quoting Mendoza, 195 F.3d at 1246).  "[F]lirtation is not sexual harassment."  Id.

Patterson does not direct the court to any cases to show that homosexual flirtation should be

treated differently than heterosexual flirtation.

The July 13, 2006, incident is less severe than the incident described in Gupta, which the

Eleventh Circuit decided was not sexual harassment.  The court in Gupta considered a similar

scenario:

> Of all the conduct about which [the plaintiff] complains, the most serious is [the
> actor's] placing his hand on her knee once, and his touching the hem of her dress
> once.  He should not have done either of those things.  But those were only two
> incidents in a period of six or seven months during which they were interacting
> (out of an even longer period during which the two worked for the [same
> employer]).  Each incident was only momentary, and neither was coupled with
> any verbal suggestions or advances.  See Minor, 174 F.3d at 857 (no hostile
> environment where the supervisor, among other things, on one occasion "put his
> arms around [the plaintiff], kissed her, squeezed her, and said, 'Now, is this
> sexual harassment?'").

Id. (first three alterations added, last alteration in original).[9]

Assuming that the July 13, 2006, incident was sexual in nature and that it upset Patterson,

it was nevertheless an isolated, brief occurrence.  The incident ended when Patterson asserted her

---

[9]To be sure, the Gupta decision found that the plaintiff had "a 'reasonable good faith
belief' that she was being sexually harassed," Gupta, 212 F.3d at 586, but the plaintiff endured
more than two incidents of touching.  Id. at 584-86.  The parties did not dispute whether the
plaintiff participated in a protected activity for purposes of a retaliation claim.  Id. at 587.

displeasure with the situation and, although Patterson accuses Perry of interfering with her job performance in several ways, there are no facts in the record tending to show that Perry interfered with Patterson's job performance when Perry rubbed against Patterson's arm for a short period of time on July 13, 2006.  Consequently, the July 24, 2006, grievance was not a statutorily protected activity.  Patterson has not set up a prima facie case for retaliation.

The motion for summary judgment is **GRANTED** as to **Counts One and Two**. Although summary judgment is proper for the foregoing reasons alone, the court will evaluate other arguments that support summary judgment on each of Patterson's claims of retaliation.

### B.      Patterson's Truck and Route

This claim fails because Patterson did not establish a prima facie case.  In order to satisfy the third element of her prima facie case, Patterson must show "a causal link between the protected expression and the adverse action."  Sullivan, 170 F.3d 1059.  "To establish a causal connection, a plaintiff must show that 'the decision-makers [were] aware of the protected conduct,' and 'that the protected activity and the adverse action were not wholly unrelated.'" Gupta, 212 F.3d at 590 (citation omitted, alteration in Gupta); see E.E.O.C. v. Reichhold Chemicals, Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993) ("This court has interpreted the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.") (citation omitted).  Absent other evidence of causation, temporal proximity between the protected activity and the adverse action must be close in order to show a causal connection.  Higdon v. Jackson, 393 F.3d 1211, 1220-21 (11th Cir. 2004) ("By itself, the three month period between the [protected activity] and the [challenged action] does not allow a reasonable inference of a causal relation between the

protected expression and the adverse action.").

Annan, who was unaware of the possibility that Patterson accused Perry of sexual harassment, was in charge of assigning which trucks were assigned to which routes. He also decided which stops and loads were assigned to which routes. Although Johnson suggested that Patterson would need to address her concerns about driving a P1000 to Perry, there is nothing to show that Perry had the power to reassign a P700 to Patterson's route. Patterson argues that Perry's apparent displeasure with the fact that Patterson was assigned a P700 in February 2007 while her P1000 was slated for maintenance and repair goes to show that Perry exercised some control over the kind of package car that was assigned to Patterson's route. Without more, the fact that Perry may have been unhappy about Patterson's assignment to a P700 while her P1000 was being repaired does not show that Perry assigned trucks to routes or drivers. Patterson has not shown that the decision-maker was somebody other than Annan or that Annan was aware of the statutorily protected activity. She has failed to set up a prima facie case.

UPS also articulated legitimate, nondiscriminatory reasons for its conduct. Annan assigned the package car to Patterson's route and decided what stops and loads were assigned to that route. Patterson does not include Annan in the list of individuals who retaliated against her. Also, UPS explained that all drivers are expected to be able to drive all of the trucks available at their station. UPS showed that package volume and route size determine what kind of truck is assigned to a particular route. In other words, the identity of the person driving the route does not influence UPS's decision to assign a particular package car to a particular route. Similarly, the number of stops and loads on a particular route is based entirely on business demand. The assignment of the P1000 to Patterson's route and the number of stops and loads on Patterson's

route were based on those legitimate factors.  The veracity of UPS's articulated reasons is supported by the facts that a P1000 has been assigned to Patterson's route, and that the number of stops and loads has stayed the same or increased, from the summer of 2006 through the present day.

Patterson seeks to establish that UPS's articulated reasons for assigning a P1000 to her route are pretext by pointing out that Annan gave her a P700 back for a short period of time, that other drivers on Patterson's route insinuated that Patterson must have upset somebody to deserve the P1000, that Patterson had difficulty driving and using the P1000, that Johnson told Perry that she would "need to see Elaine [Perry] about" the assignment of a P1000 to Patterson's route, that Fore's request for a specific truck was honored, that Perry said "oh you're in [P700 truck number] 65181, huh" and looked at Patterson when Patterson was assigned the P700 while her P1000 was slated for maintenance and repair.  Patterson seeks to establish that UPS's articulated reasons for the increased number of stops and loads on Patterson's route are pretext by showing that UPS management expected Patterson to make her deliveries on time despite the added stops and loads and that other drivers asked Patterson how she was able to make all of her daily stops.

Patterson makes little effort to explain the relevance of the facts she lists in her response.  None of the facts that Patterson cites show that the legitimate, nondiscriminatory reasons that UPS articulated are pretext.  Patterson has not shown that anybody other than Annan had anything to do with the truck or route assignments.  In fact, she agrees that Annan is "the supervisor you would talk to" if you were a driver who needed a different truck.  The evidence Patterson advances regarding third-party insinuation, comments by people other than Annan and Perry that Patterson should speak to Perry about her truck, and a vague allegation about Perry

28

staring at Patterson, do not advance her case.   The fact that Patterson complained that her truck was difficult to drive is immaterial because, like all of the drivers at the Loxley Center, Patterson was expected to be able to drive all of the trucks at the Loxley Center.

The relevance of the fact that UPS expected Patterson to make her deliveries on time is not readily apparent.  Although other drivers asked Patterson how she was able to make all of her stops in a day, there is nothing in the record to show that Annan, who was the one that created the route and was unaware of Patterson's allegedly statutorily protected activity, created the route in an effort to retaliate against Patterson.  Perry is the one who allegedly retaliated against Patterson in this regard, but it is undisputed that Perry did not create the route.

Finally, although Patterson says that Fore's request for a new truck was honored, she does not base any of her argument on this fact.  She also does not show that, based on the criteria UPS considered when determining what kind of truck to assign to a given route, that the truck Fore requested was not appropriate for his route or, more to the point, that a P700 was appropriate for Patterson's route.

In light of the foregoing, Patterson has not rebutted UPS's articulated, legitimate reasons for its actions.

### C.      Patterson's Method of Entering and Exiting Her Truck

Patterson abandoned this claim when she did not argue in support of it in her response to the motion for summary judgment.

Also, Patterson complained that Perry inappropriately criticized Patterson's method of entering and exiting her truck in her July 24, 2006, grievance.  Consequently, to the extent that Patterson relies on these comments, the offensive conduct must have occurred before Patterson

engaged in a statutorily protected activity and Patterson cannot show the causation element of her prima facie case.

To the factually-unsupported extent that Perry criticized Patterson about failing to use the truck's handrails after July 24, 2006, UPS showed that Perry was enforcing generally-applicable UPS safety procedures when she criticized Patterson.  Patterson does not explain how the fact that Perry's safety instructions were more stringent than the unnamed supervisor's goes to show that Perry's articulated reason for ordering Patterson to use the handrail when entering and exiting the package car was pretext.

### D.     Medical Care

Patterson made it clear in her deposition that UPS did not interfere with her efforts to see her own personal doctor.  Consequently, the focus of Patterson's complaint is that individuals at UPS interfered with Patterson's ability to see a worker's compensation doctor at UPS's expense. Although Patterson's response to the motion for summary judgment lists facts that are relevant to this claim, she does not advance a single argument based on them.  For this reason alone, the motion would be granted on the medical care claim because Patterson abandoned it. Nevertheless, the facts that pertain to this claim show that Patterson's medical care claim fails for additional reasons.

A large part of Patterson's claim that she was denied medical care is based on Patterson's allegation that Johnson and Young inappropriately accompanied her when she visited the worker's compensation doctors.  Because it is undisputed that neither Johnson nor Young knew about Patterson's statutorily protected activity, Patterson has not shown the causation element of her prima facie case.

Patterson also asserts that Flood "instructed Patterson to wear her UPS uniform at all times," but that another injured driver who was performing the same job function as Patterson "was allowed to dress up in her blue jean outfit everyday." (Doc. 36-3, p. 12, ¶ 28). Other than listing these facts in her response, Patterson does not assert that these facts have any relevance to her case. Because Flood did not know that Patterson had accused Perry of sexual harassment, the facts do not have any relevance. Patterson has not made a prima facie case that she was retaliated against when she was accompanied to the UPS doctor's office.[10]

UPS articulated a legitimate, nondiscriminatory reason for the actions Perry took with respect to Patterson's medical claim. When Perry learned that Patterson wanted to visit a UPS doctor in 2007, Patterson's request was forwarded to the district management that administers such requests. There is no evidence that Perry submitted a "doctored" request on Patterson's behalf. There is also no evidence that district management knew about Patterson's July 24, 2006, grievance. The district management did not approve Patterson's request until March 2007, after Patterson returned from a leave of absence with a note from her doctor releasing her to work with modified duties. In sum, UPS showed that Perry submitted Patterson's request for a medical visit through the standard channels and that somebody other than Perry, who was unaware of Patterson's July 24, 2006, grievance, decided whether to send Patterson to the UPS doctor.

Patterson explains that she visited a doctor in 2003 without a supervisor escort and

---

[10]Patterson testified in her deposition that Flood made her wear her uniform because Perry "said so." (Doc. 31-8, p. 9). Patterson did not cite to this testimony in her response. Had she done so, the court would not have considered it for the truth of whether Perry said that Patterson had to wear hear uniform because it is hearsay.

without the necessity of getting approval from district management.  There are no facts in

evidence tending to show that UPS employed the doctor Patterson visited in 2003.  If the doctor

Patterson visited in 2003 was her personal doctor, then her argument fails because there is no

evidence that UPS interfered with Patterson's ability to visit her personal doctor after July 24,

2006.  In any event, Patterson went to the doctor in 2003 because she broke her hand fleeing a

dog at work.  It is undisputed that Patterson's supervisors need not seek management approval

for a doctor's visit if there is an immediate medical need.  Even if Patterson visited a UPS doctor

rather than her personal doctor in 2003, the difference between that visit and the visits three

years later, after July 24, 2006, undermine Patterson's attempt to show that UPS's articulated

reasons are false, insincere, or otherwise pretext.  Patterson has not rebutted the legitimate reason

that UPS articulated for the actions that Perry took**.**

### E.        Helper

Like her claim that UPS retaliated against her with respect to medical care, Patterson lists

facts that go to her claim that she was inappropriately denied a helper but she makes no

argument on the issue.  Summary judgment on this claim could be granted because it is

abandoned.

In addition, Perry, the only supervisor who knew about Patterson's complaint of sexual

harassment, had nothing to do with assigning helpers to Patterson or anybody else at Loxley

Center.  Consequently, Patterson has not made up a prima facie case because she has not shown

causation.

### F.        Lying and "Turning Things Around"

Patterson's claim that Perry retaliated against her by lying and turning things around fails

because Patterson has not shown that Perry's conduct meets the second element of her prima

facie case, that she suffered "an adverse employment action."  Sullivan, 170 F.3d at 1059.  The

challenged action must be "materially adverse" to a "reasonable employee."  Burlington

Northern & Santa Fe Ry. v. White, 126 S. Ct. 2405, 2415 (2006).  In other words, the

defendant's challenged actions must be of a nature that "well might have 'dissuaded a reasonable

worker from making or supporting a charge of discrimination.'"  Id.  The foregoing test altered

somewhat the application of the second factor of the prima facie case in this judicial circuit.  See

Bothwell v. RMC Ewell, Inc., 226 Fed. Appx. 925, 926 (11th Cir. 2007) (noting that Burlington

Northern "changes the law that must be applied in this circuit") and Moore v. ITT Tech. Inst.,

226 Fed. Appx. 869, 871 (11th Cir. 2007) (noting that Burlington Northern held Title VII

retaliation claims are "not limited to employer's actions that affect the terms, conditions or status

of employment, or even to those that occur at the workplace.").  The Burlington Northern

decision emphasizes that a challenged action must be materially adverse in light of the fact that

Title VII is not "a general civility code for the American workplace."  Burlington Northern, 126

S. Ct. at 2415 (internal quotations and citations omitted).

> An employee's decision to report discriminatory behavior cannot immunize that
> employee from those petty slights or minor annoyances that often take place at
> work and that all employees experience.  See 1B.Lindemann & P. Grossman,
> Employment Discrimination Law 669 (3d ed. 1996) (noting that "courts have held
> that personality conflicts at work that generate antipathy" and "'snubbing' by
> supervisors and co-workers" are not actionable under [the anti-retaliation
> statute]).

Id.

The motion for summary judgment would also be **GRANTED** as to Patterson's claims

that Perry lied and "turned things around" because this element of the claim is not an adverse

employment action.  Patterson does not dispute that this claim is based entirely on a note that she found in the trash can.  There is no evidence that anything happened to this note other than its creation and subsequent disposal in the garbage.

**VII.    CONCLUSION**

The motion for summary judgment is **GRANTED** in its entirety for all of the foregoing reasons.  To the extent that this order does not address the motion to strike, it is **MOOT**.

**DONE** and **ORDERED** this 23rd day of February, 2009.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE